FILED

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2019 APR 30  AM 10: 24

US DISTRICT COURT
BRIDGEPORT CT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH 260-693-8247 THAT IS STORED AT PREMISES CONROLLED BY TEXTPLUS. | Case No. 3:19mj703(HBF)<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Jennifer A. Berry, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by textPlus, a wireless provider headquartered at 13160 Mindanao Way Suite 217, Marina del Rey, CA 90292.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require textPlus to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.  I am a Special Agent with the Federal Bureau of Investigation (FBI).  I have been a Special Agent with the FBI for approximately fourteen years.  I was a Supervisory Special Agent with the FBI from 2005 until 2011.  I am currently assigned to the Safe Streets Task Force, which is comprised of personnel from the FBI, the Bridgeport Police Department, the Norwalk Police Department, the Fairfield Police Department and the Trumbull Police Department.  During my tenure as a supervisor, I spent approximately three years at FBI

Headquarters working in counterintelligence, and most recently spent approximately three years in the New Haven, Connecticut Field Office as the supervisor of the domestic terrorism squad. Prior to becoming a supervisor, my work as a Special Agent in the field included more than three years working narcotics investigations in the Boston Field Office, two years working counterterrorism investigations in the Boston Field Office, and one year working narcotics investigations in the San Juan Field Office. During my tenure with the FBI, I have worked a variety of cases and investigative matters including those involving the possession of unlawful weapons, narcotics, violent crime, counterintelligence and counterterrorism.

3. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am the co-case Agent assigned to the current investigation.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, Task Force Officers, confidential human sources (CHS), and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) and 846 (illegally distribute controlled substances and conspiracy) have been committed by an individual known as "JEEZY". There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

6.      On October 10, 2012 at approximately 6:20 p.m., an unresponsive black male with blood on his face was discovered in the driver seat of a vehicle near 220 Sunshine Circle, Bridgeport, Connecticut (Trumbull Gardens area).  The vehicle, a black 2001 Nissan Maxima with Connecticut registration 878YUA, was idling and its wipers were activated.  The victim, identified as Dawayne Cobb, DOB 07/01/1988, was pronounced deceased at 6:29 pm.  The victim was observed to have a gunshot wound to the right posterior shoulder and the right abdomen.  A spent shell casing was observed on the floor of the rear passenger side of the vehicle.

7.      A resident of Sunshine Circle reported hearing three guns shots between 11:00 am and 1:00 p.m. on October 10, 2012.

8.      Cobb's cellular telephone with number 203-913-2068 serviced by Sprint/Nextel was located at the scene.  A review of Cobb's cellular telephone revealed two numbers stored for "JEEZY":  203-545-2547 (Sprint/Nextel) and 260-693-8247 (textPlus).  Cellular telephone number 260-693-8247 was activated on September 16, 2012.  A review of Cobb's text messages stored on his cellular telephone showed a series of text messages with "JEEZY" on October 9, 2012 and October 10, 2012.   In my training and experience, a "zero second duration" often indicates a text message.  A review of Cobb's Sprint/Nextel cellular telephone records for telephone number 203-913-2068 showed numerous zero second duration contacts with telephone number 260-693-8247 on October 9, 2012 and October 10, 2012.  The following series of texts occurred on October 9, 2012 between Cobb and Jeezy:

12:47 pm -     Jeezy to Cobb - U gna b around today

12:47 pm -     Cobb to Jeezy - Yea how much u need?

1:31 pm -      Jeezy to Cobb - My white boys need tryna spend 550 but

I'm tryna make sumn 2 feel me

1:31 pm -      Jeezy to Cobb - Wat can u do

2:22 pm -      Cobb to Jeezy - A zip and four 8ths....I'll throw u a ill

something too!!!

2:22 pm -      Jeezy to Cobb - He coming from Seymour wen u gna b

around so I can tell him come down

2:48 pm -      Cobb to Jeezy - After 7

2:48 pm -      Jeezy to Cobb - Ite Imma tell him come down @7 so dat

give u time

2:48 pm -      Cobb to Jeezy - Tell him 8

3:06 pm -      Jeezy to Cobb - Ite

8:21 pm -      Jeezy to Cobb - He said he leavin in 15 min gta pick his

gurl up from work

8:21 pm -      Cobb to Jeezy - Yo

8:21  pm -      Jeezy to Cobb - My mans here wit me

8:35 pm -       Cobb to Jeezy -  Aight I gotta run to Stamford n pick up my daughter he home be around in an hr?

8:35 pm -       Jeezy to Cobb -  He said OK but he kinda n a rush he gta go home and get ready to go back to campus

8:46 pm -       Cobb to Jeezy -  Aight where I'm going

8:46 pm -       Jeezy to Cobb - Sunshine circle

9:59 pm -       Cobb to Jeezy -  I'm coming now

10:18 pm -      Cobb to Jeezy - Yo call me

10:50 pm -      Cobb to Jeezy - I'm outside

10:50 pm -      Jeezy to Cobb - I'm coming out Imma have a funny hat on

10:50 pm -      Cobb to Jeezy - Yo where u at?

11:04 pm -      Jeezy to Cobb - My mans left I tried to call u but my phone ran out of minutes he said n the morning he can he can leave campus

11:04 pm -      Cobb to Jeezy - Tell him to come in the morning and I got him

11:04 pm -      Jeezy to Cobb - Ok he gnats text me

The following series of texts occur on October 10, 2012 between Cobb and Jeezy:

10:06 am -    Jeezy to Cobb - U gna b around by 12

10:17 am -    Cobb to Jeezy - I'm around now

10:17 am -    Jeezy to Cobb - Ite Imma let him know he coming from southern

10:17 am -    Cobb to Jeezy - Aight

11:34 am -    Jeezy to Cobb - Wuddup he here

11:34 am -    Cobb to Jeezy - Aight y'all wanna swing through my crib

11:34 am -    Cobb to Jeezy - I'm on my way

11:34 am -    Jeezy to Cobb - He scary he said he wanna buy nd go back to

skool

11:48 am -    Cobb to Jeezy - Wit number house

9.  A CHS who knew Cobb for approximately one year told law enforcement that he/she has overhead Cobb talking about the sale of crack on the telephone as recently as one month ago.

10. Based on the text messages, it is believed that Cobb was arranging with "JEEZY" to conduct a narcotics transaction. It is further believed that "JEEZY" had a customer and Cobb was to be the supplier. The requested information will assist in determining "JEEZY's" identity, the identity of "JEEZY's" customer, and other associates of "JEEZY".

11. I have learned that textPlus is a company that provides cellular telephone access to the general public, and that stored electronic communications, including text and multimedia

messages for textPlus subscribers, may be located on the computers of textPlus. Further, I am aware that computers located at textPlus contain information and other stored electronic communications belonging to unrelated third parties.

12. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by textPlus for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

13. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved. Many wireless providers retain information about the location in which a particular communication was transmitted or

7

received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

14. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

15. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the

services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

16. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

17. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require textPlus to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

18. Based on the forgoing, I request that the Court issue the proposed search warrant.

19. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

20. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

21. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jennifer A. Berry
Special Agent
FBI

Subscribed and sworn to before me on November 5, 2012

THE HONORABLE HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with 260-693-8247 that is stored at premises owned, maintained, controlled, or operated by textPlus, a wireless provider headquartered at 13160 Mindanao Way, Suite 217, Marina del Rey, CA 90292.

## ATTACHMENT B

### Particular Things to be Seized

### I. Information to be disclosed by textPlus

To the extent that the information described in Attachment A is within the possession, custody, or control of textPlus, including any messages, records, files, logs, or information that have been deleted but are still available to textPlus or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), textPlus is required to disclose the following information to the government for each account or identifier listed in Attachment A: All text and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

    a.    All existing printouts from original storage of all of the text messages described above;

    b.    All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from September 16, 2012 to present;

    c.    All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message, including IP address records for each text messaging contact;

    d.    All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names,

addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

  e. Detailed billing records, showing all billable calls including outgoing digits, from September 16, 2012 to present;

  f. All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from September 16, 2012 to present;

  g. Incoming and outgoing telephone numbers, from September 16, 2012 to present;

  h. All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

  i. All records pertaining to communications between textPlus and any person regarding the account or identifier, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21 U.S.C. Sections 841(a)(1) and 846 involving "JEEZY" since September 16, 2012 including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.    Any and all text messages from September 16, 2012 to the present related to 260-693-8247.

b.    Records relating to who created, used, or communicated with the account or identifier, including records about the IP addresses of the sender or receiver, their identities and their whereabouts.

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by textPlus and my official title is _____. I am a custodian of records for textPlus. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of textPlus, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business activity of textPlus; and

    c.    such records were made by textPlus as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____  _____
Date                                          Signature